1

2

3

4

5

6

7

8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12  MAHER DARRAJ, an individual;        )   Civil No.11cv1657 AJB (BGS)
    and NADER DARRAJ, an individual,    )

13                      Plaintiffs,     )   ORDER GRANTING IN PART AND
                                        )   DENYING IN PART
14  v.                                  )   DEFENDANTS' MOTION FOR
                                        )   SUMMARY JUDGMENT
15  COUNTY OF SAN DIEGO; JASON          )
    TITUS, an individual; Jason Philpot, an )   (Doc. No. 26)
16  individual; Stephen Walton, an      )
    individual; and DOES ONE            )
17  THROUGH TWENTY-FIVE                 )
                                        )
18                      Defendants.     )
    _____)

19          On July 26, 2011, Plaintiffs Maher Darraj ("Maher") and Nader Darraj ("Nader")

20  (collectively, "Plaintiffs") filed the instant Complaint arising under 42 U.S.C. § 1983 and

21  California law.  (Doc. No. 1.)  The Complaint was filed against the County of San Diego

22  ("County"), Sheriff Deputy Jason Titus ("Deputy Titus"), Sheriff Deputy Jason Philpot

23  ("Deputy Philpot"), and Sheriff Deputy Stephen Walton ("Deputy Walton") (collectively,

24  "Defendants").  (*Id.*)  Plaintiffs filed a First Amended Complaint ("FAC") as a matter of

25  right on December 6, 2011.  (Doc. No. 5.)  Presently before the Court is Defendants'

26  motion for summary judgment on Plaintiffs' FAC.  (Doc. No. 26.)  Plaintiffs filed a

27  response in opposition on March 18, 2013, (Doc. No. 31), and Defendants filed a reply in

28  support on March 29, 2013, (Doc. No. 32).

# BACKGROUND

The instant action arises from an incident that occurred at Plaintiffs' apartment complex on the evening of July 28, 2010, wherein Plaintiffs were arrested by Deputy Titus, Deputy Philpot, and Deputy Walton.  The parties each provided their version of the facts, each supported by declarations and deposition testimony.  However, these versions of the facts each provided a radically different portrayal of the events that transpired on the evening of July 28, 2010.  Therefore, the Court outlines two versions of the facts, one presented by Plaintiffs and the other presented by Defendants.

## I.    Plaintiffs' Rendition of the Facts

Plaintiffs Maher and Nader reside in the same apartment unit in a complex located in El Cajon, California.  (Doc. No. 31, Ex. 1, Maher Decl. ¶ 2; Doc. No. 31, Ex. 2, Nader Decl. ¶ 4.)  Plaintiffs' apartment is located on the ground floor of a six-unit complex, and is adjacent to the unit occupied by their older brother Doory Darraj ("Doory") and his wife and three small children.  (*Id.*)  Just outside Plaintiffs' apartment is a grassy area with a picnic table located in the center.  (*Id.*)

On night in question, Wednesday, July 28, 2010, Maher, Nader, Doory, and no more than five or six of Plaintiffs' friends were all gathered around the picnic table outside Plaintiffs' apartment.  (Doc. No. 5 ¶ 9; Doc. No. 31, Ex. 1, Maher Decl. ¶ 9; Doc. No. 31, Ex. 4, Nader Decl. ¶¶ 4, 13.)  Hazam Omar ("Hazam"), a friend of Plaintiffs, was also present, but was inside Plaintiffs' apartment when the incident began.  (Doc. No. 31, Ex. 1, Maher Decl. ¶ 3; Doc. No. 31, Ex. 4, Nader Decl. ¶ 4.)  At approximately 11:00 p.m., an hour after Hazam first arrived at Plaintiffs' apartment, Plaintiffs allege that Hazam's wife, Esmeralda Henry ("Ms. Henry"), pulled into the driveway of Plaintiffs' apartment complex.  (Doc. No. 31, Ex. 1, Maher Decl. ¶ 4; Doc. No. 31, Ex. 4, Nader Decl. ¶ 5)

After Ms. Henry pulled into the driveway, Maher saw Doory walk up to Ms. Henry's car.  (Doc. No. 31, Ex. 2, Maher Decl. ¶ 4.)  Maher then alleges that as Ms. Henry and Doory were talking, Deputy Titus rushed up to Doory, grabbed him around the

neck, began choking him using a carotid restraint, and then ultimately forced Doory to the ground.  (Doc. No. 31, Ex. 1, Maher Decl. ¶¶ 4, 5.)  Maher further alleges that Doory did not yell at Ms. Henry or otherwise lean his body into the car prior to any of Deputy Titus' actions, and that Deputy Titus did not warn or say anything to Doory before attacking him.  (*Id*.)  Maher also alleges that he heard Ms. Henry tell Deputy Titus multiple times during the altercation, "That's not Hazam," but that Deputy Titus contin- ued to restrain Doory, ultimately bringing Doory to the ground.[1]  (*Id*.)

Maher then alleges that he took a few steps towards Deputy Titus and stated, "This is not Hazam. This is my brother. It's not Hazam."  (*Id*. at ¶ 7.)  Maher alleges that Deputy Titus thereafter told him to sit down on a nearby wooden curb, and after he complied, Deputy Titus walked over to him and hit him in the nose with something very heavy.  (*Id*. at ¶ 8.)  Maher alleges the blow to his face knocked him unconsciousness for a few seconds, and when he regained consciousness, he was lying face down on the driveway with one of the deputies' knees in his back.  (*Id*.)

Nader contends he witnessed the altercation between Deputy Titus and Maher.  (Doc. No. 31, Ex. 4, Nader Decl.)  Nader alleges that he saw Maher move from the picnic table to where Doory and Deputy Titus were located.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 7; Doc. No. 31, Ex. 5, Nader Depo. at 34:12-21.)  Nader then alleges he saw Deputy Titus leave Doory and walk a few steps toward Maher, wherein Deputy Titus hit Maher in the face with what appeared to be a flashlight or a baton.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 7.)  Nader alleges he did not make any movements or verbalize any comments to any of

---

[1] Nader did not see Doory approach Ms. Henry's vehicle, and first witnessed any contact between Deputy Titus and Doory when he saw Deputy Titus choking Doory. (Doc. No. 31, Ex. 4, Nader Decl. ¶¶ 5, 6.)  Nader made these observations while standing in the doorway of his apartment.  (Doc. No. 31, Ex. 4, Nader Decl. ¶¶ 5, 6; Doc. No. 31, Ex. 5, Nader Depo. at 29:22-25, 30:23-31:11; 32:16-25.)  Nader further alleges that Doory was not fighting or otherwise resisting Deputy Titus in any way prior to or during the altercation.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 6.)

the deputies until he saw Deputy Titus hit Maher in the face.[2]  (Doc. No. 31, Ex. 5, Nader Depo at 35:3-8.)

After Nader saw Deputy Titus choke Doory and hit Maher in the face, Nader alleges he told a second deputy present at the scene, "What happened with me and my brother, mother fucker?"[3]  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 9; Doc. No. 31, Ex. 5, Nader Depo. at 36:1-11.)  While making this statement, or soon thereafter, Nader alleges he took a few steps forward, which was in the direction of the driveway, closer to the second deputy and father away from Maher.[4]  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 9; Doc. No. 31, Ex. 5, Nader Depo. at 51:7-25.)

After Nader moved to this new location under the tree, Nader alleges the second deputy fired a taser gun at him.[5]  (Doc. No. 31, Ex. 5, Nader Depo. at 57:8-23.)  Nader further alleges that this deputy did not say anything before deploying the taser, nor did this deputy give Nader any warning that he was planning to deploy the taser.[6]  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 10; Doc. No. 31, Ex. 5, Nader Depo. at 58:12-18.)  After Nader resumed consciousness, which he contends was approximately ten seconds later, Nader alleges he was handcuffed by one of the deputies, placed face down on the ground, put in

---

[2] Nader alleges that Maher never pushed, grabbed, or touched Deputy Titus prior to Deputy Titus hitting Maher in the face.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 8.)  After Deputy Titus struck Maher in the face, Nader testifies that Maher was bleeding, and it appeared that Maher was injured and in severe pain.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 7.)

[3] This statement was made after Ms. Henry exited her vehicle and after Nader witnessed the second Deputy "spray" Nader's sister-in-law and Daniella (the sister-in-law's daughter) with an un-identified substance.  (Doc. No. 31, Ex. 5, Nader Depo. at 52:8-53:9.)  This substance was later identified to be pepper spray.

[4] Even at this new location, Nader alleges he was still a "safe distance from the deputies."  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 9.)

[5] Nader's deposition testimony indicates that the same deputy who used the pepper spray  on his sister-in-law and Daniella also fired the taser gun at him.  (Doc. No. 31, Ex. 5 at 57:8-23.)  However, Nader's declaration states that Deputy Titus struck him with the taser gun.  (Doc. No. 31, Ex. 4, Nader Decl. ¶ 10.)

[6] When the deputy deployed the taser, Nader alleges he was approximately eight to ten feet from the deputy.  (Doc. No. 31, Ex. 5, Nader Depo. at 4:17.)

the backseat of the police car, and then taken to jail for booking.  (Doc. No. 31, Ex. 5, Nader Depo. at 62:1-6, 63:3-6.)

After the incident at Plaintiffs' apartment, Plaintiffs were taken to jail and booked on two separate felony charges: (1) violation of Penal Code § 405(a), lynching; and (2) violation of Penal Code § 69, resisting an officer by force and violence.  (Doc. No. 31 at 4:16-20.)  On December 12, 2010, a two-day preliminary hearing was held in San Diego Superior Court before Judge Thompson.  (Doc. No. 31, Ex. 9.)  At the conclusion of the preliminary hearing, Judge Thompson found that there was insufficient facts to find that the crimes had been committed.  (*Id*.)  Accordingly, all criminal charges against Plaintiffs were dismissed.  (*Id*. at 331:12-16.)

## II.     Defendants' Rendition of the Facts

Defendants present the following facts regarding the incident in question.  On July 28, 2010, Deputy Titus received a radio call dispatching him to contact Ms. Henry, who had called 9-1-1 earlier that evening to report a domestic violence incident.  (Doc. No. 26, Ex. A, Titus Depo. at 40-43.)  After receiving the call, Deputy Titus met Ms. Henry in the parking lot of a convenience store (7-Eleven), wherein Ms. Henry informed him that she had a valid restraining order against Hazam (her husband), and that Hazam had violated the restraining order earlier that evening when he coaxed her out of her apartment and beat her.  (*Id.* at 43:4-44:7, 52:3-18.)  Deputy Titus alleges that Ms. Henry was tearful, shaken, and had visible injuries that she attributed to the recent and prior physical abuse inflicted by Hazam.  (*Id.* at 44:9-19.)  Ms. Henry then indicated that she could take Deputy Titus to Hazam's location, but could not give Deputy Titus the address of the location because she did not know it.  (*Id.* at 55:5-10, 58:1-13.)  Therefore, Deputy Titus instructed Ms. Henry to drive to the location, park her car on the street, and point Deputy Titus in the direction of the residence.  (*Id.*)  Deputy Titus asked Deputy Walton and Deputy Philpot to accompany him to the location to provide additional security and a law enforcement presence.  (*Id*. at 57:19-23.)

After Ms. Henry pulled into the driveway of Plaintiffs' apartment, Deputy Titus, Deputy Philpot, and Deputy Walton parked their cars and walked in the direction of the driveway. (*Id.* at 74:24-75:1; 78:2-5.) While walking towards the driveway, Deputy Titus alleges that he heard someone yelling in a foreign language, and saw a group of at least six men standing in the vicinity of the grassy area in front of Plaintiffs' apartment. (*Id.* at 78:6-9, 78:12-14.) Deputy Titus also alleges that he saw a man start walking towards Ms. Henry's car and heard yelling. (*Id.* at 78:9-11.) Upon hearing yelling, Deputy Titus alleges that he ran around a bush, looked down the driveway in the direction of Ms. Henry's car, and when the car came into view, saw a man with his upper torso leaned into the car. (*Id.* at 78:20-79:25, 81:5-6, 81:11-13.)

After viewing the unidentified man (who was later identified as Doory) lean into Ms. Henry's car, Deputy Titus alleges that he ran up to the vehicle and began giving verbal instructions to Doory to "Step away from the car," "Move away from the car," and "Sit down on the curb line." (*Id.* at 85:14-22.) At that point, Deputy Titus alleges that Doory removed his upper torso from the inside of the car, brought his hands up, began waving his hands around, and starting saying, "What? I did nothing to her." (*Id.* at 85:24-86:4.) Deputy Titus then alleges that Doory began walking backwards towards the group of men located on the grassy area. (*Id.*) After Doory failed to follow his instructions and sit on the curb, Deputy Titus alleges that he instructed Doory to "Turn around away from me, bring your hands to the small of your back." (*Id.* at 88:7-14.) Deputy Titus then alleges that when he went to take hold of Doory's hands to place handcuffs on him, Doory yanked his hands up, roughly to shoulder height, and then swung his elbow backwards towards Deputy Titus' head. (*Id.* at 92:6-11.) After Doory swung his other elbow in the direction of Deputy Titus, Deputy Titus attempted to block the strike with his right hand and right forearm. (*Id.* at 93:16-17.) Deputy Titus then moved forward and put all his body weight into Doory's back, came over the top of Doory's body, and applied a carotid restraint with maximum pressure. (*Id.* at 16-20.) Doory then went

6

unconsciousness and Deputy Titus held Doory up so he would not fall to the ground. (*Id.* at 95:22-96:6.)

Deputy Titus then alleges that when the altercation with Doory first started, there was a lot of yelling and screaming from the men located on the grassy area in front of Plaintiffs' apartment.  (*Id.* at 96:25-97:2.)  Deputy Titus alleges that these men started running towards him, and that as Deputy Titus was dropping Doory to the ground so that Deputy Titus could move away from these individuals, one of the individuals, who was later identified as Maher, hit him in the upper right side of Deputy Titus' body armor.[7] (*Id.* at 97:14-21, 98:5-7.)  As Deputy Titus spun around to see who had hit him, he saw that Maher was already lying on the ground with Deputy Philpot on his back, who appeared to be utilizing a carotid restraint to immobilize Maher.  (*Id.* at 100:6-11.)

Prior to immobilizing Maher, Deputy Philpot alleges that Maher was yelling "Fuck you.  That's my brother, fuck you," and appeared to be visually upset.  (Doc. No. 26, Ex. C, Philpot Depo. at 71:9-20.)  Specifically, Deputy Philpot alleges he could see the veins bulging in Maher's neck, could see that Maher's face was red and sweating, and watched Maher beat on his chest while spit was coming from his mouth because he was yelling. (*Id.*)  Deputy Philpot then alleges that he told Maher to sit down, in an attempt to create a "reactionary gap" between himself and Maher.[8]  (*Id.* at 72:24-5.)  Although Maher initially sat down, Deputy Philpot alleges Maher stood right back up.  (*Id.* at 74:1-3.) Deputy Philpot then alleges that Maher began yelling towards the people behind him, beckoning them to move forward in the direction of Deputy Titus, and that as a result, Deputy Philpot put his hands up and said "get back" and "stay back" several times.  (*Id.* at 77:25-78.)  Thereafter, in an attempt to detain Maher, Deputy Philpot alleges he instructed Maher to turn around, but as he was trying to restrain him, Maher began

---

[7] Deputy Titus also alleges that during this time there was constant movement by the individuals present on the scene, and that he heard yelling and cussing in a foreign language.  (*Id.* at 98:14-21.)

[8] Deputy Philpot alleges that he wanted to create a "reactionary gap" between himself and Maher because he had already seen Maher "get physical" with Deputy Titus. (*Id.* at 73:1-22.)

pulling his arms out and away from his body.  (*Id*. at 80:7-22.)  Deputy Philpot then alleges that Maher turned around to face Deputy Philpot, and because he thought Maher was a threat, Deputy Philpot encircled Maher's neck with his right arm and placed him in a carotid restraint.  (*Id*. at 81:2-14.)  Because Maher resisted, Deputy Philpot fell backwards and twisted on top of him, such that Maher landed on the ground in a prone position on his stomach.  (*Id*. at 81:19-82:5.)  As soon as Maher landed on his stomach, Deputy Philpot alleges he instructed Maher to "stop resisting" and "place his hands behind his back."  (*Id*. at 83:19-21.)

When Deputy Walton saw Deputy Philpot struggling with Maher, he ran over to assist Deputy Philpot.  (Doc. No. 26, Ex. B, Walton Depo. at 50:2-22.)  Thereafter, Deputy Walton placed his weight on Maher's upper legs to control Maher because he was trying to get up off the ground.  (*Id*. at 54:18-24.)  Deputy Walton then alleges that both he and Deputy Philpot gave Maher repeated commands to place his hands between his back so the deputies could handcuff him.  (*Id*. at 56:17-21.)  After Maher failed to comply, Deputy Walton tried to pull Maher's right arm up from underneath his body, and because this proved unsuccessful, punched Maher once in the arms and then once in the ribs.[9]  (*Id*. at 57:5-18, 58:16-18.)  Because this technique was successful, Deputy Walton was able to handcuff Maher.  (*Id*. at 57:23-25.)  When Deputy Walton placed the handcuffs on Maher he did not know what Maher was under arrest for, but believed Deputy Philpot was arresting Maher for some reason.[10]  (*Id*. at 59:21-60:4.)

Thereafter, Deputy Titus alleges that an individual in the crowd (later identified as Nader) started cussing and screaming at Ms. Henry, who was now standing near Deputy Titus outside of her vehicle.  (*Id*. at 124:12-14.)  As Nader began walking towards Ms.

---

[9] Deputy Walton alleges he punched Maher in an effort to try to "get discomfort enough so [Maher] wouldn't be so tense in his arm, like a distraction blow, so [he] could try to pull his arm out."  (Doc. No. 26, Ex. B, Walton Depo. at 57:20-23.)

[10] At some point Deputy Philpot pulled out his capsicum spray, otherwise known as pepper spray, and sprayed individuals in the crowd (later identified as Nader's sister-in-law and Daniella).  (Doc. No. 26, Ex. C, Philpot Depo. at 91:7-10, 98:24-99:6.)  Deputy Philpot did not give a warning before using the pepper spray.  (*Id*. at 98:9-23.)  The Court is not exactly sure when this event occurred.

Henry, followed by other individuals in the group, Deputy Titus yelled at Ms. Henry several times to "Get in your car.  Lock the door right now."[11]  (*Id*. at 124:14-19.)  As he did that, Deputy Titus unholstered his X26 department-issued taser, pointed it at Nader, clicked the safety to off, and pointed it at Nader's chest.  (*Id*. at 124:21-25.)  This emitted a red "target" dot, during which time Deputy Titus informed Nadar, "Stop.  Move away from here."  (*Id*. at 124:23-125:2.)  At this point Nader turned towards Deputy Titus, looked down at the red dot, and began opening and closing his hands to make a fist and rolling his chest forward.[12]  (*Id*. at 125:3-24.)  After Nader raised his right clenched fist at Deputy Titus, Nader yelled an explicative at Deputy Titus, and than lunged forward as though he was going to strike him.  (*Id*. at 126:15-127:1.)  As a result, Deputy Titus deployed the taser.[13]  (*Id*.)  Before deploying the taser, Deputy Titus alleges that he specifically told Nadar, "Move back now or you will get tased."  (*Id*. at 127:8-14.)

Following the incident, Hazam, Maher, and Nader were all taken into custody.  (Doc. No. 26 at 7:15.)  Defendants allege that although requested, witnesses present at Plaintiffs' apartment complex refused to provide any statements or identify themselves to the deputies at the scene.  (Doc. No. 26, Ex. C, Philpot Depo. at 99:7-23; Doc. No. 26, Ex. A, Titus Depo. at 114:17-22.)  The criminal prosecution that followed was ultimately unsuccessful, and all criminal charges against Plaintiffs were subsequently dropped.  (Doc. No. 26 at 7.)

---

[11] Deputy Walton alleges that he witnessed Nader wave his arms and start to lunge in the direction of Deputy Titus.  (Doc. No. 26, Ex. B, Walton Depo. at 39:15-20.)  To protect Deputy Titus, Deputy Walton alleges he told Nader several times to "Stop" and "Go Back inside," but that Nader refused his commands.  (*Id*. at 39:24-40:8.)  After Nader advanced toward Deputy Walton, Deputy Walton pulled out his taser and pointed it at Nader's chest.  (*Id*. at 41:4-42:17.)  After Deputy Walton gave Nader several warning to "get back or he would be tased," Nader complied, and sat down on a curb.  (*Id*. at 44:11-25.)  Deputy Walton also alleges he ordered people to go back inside the apartments, in a loud voice, at least five times.  (*Id*. at 40: 21-25.)

[12] During this exchange Deputy Titus alleges he was approximately eight to ten feet from Nader.  (*Id*. at 125:25-126:2.)

[13] Deputy Walton and Deputy Philpot heard, but did not see, Deputy Titus deploy the taser on Nader.  (Doc. No. 26, Ex. B, Walton Depo. at 60:18-24; Doc. No. 26, Ex. C, Philpot Depo. at 90:20-25.)

**<u>DISCUSSION</u>**

The FAC alleges six causes: (1) a § 1983 claim against Deputies Titus, Philpot, and Walton arising under the Fourth Amendment alleging the right to be free from: (a) excessive force and (b) unlawful seizure/false arrest; (2) a § 1983 claim against the County alleging unlawful policies, customs, or habits (the Monell Claim); (3) a state law negligence claim against all Defendants; (4) a state law battery claim against all Defendants; (5) a state law false arrest claim against all Defendants; and (6) a state law claim alleging violation of California Civil Code § 52.1 against all Defendants.  However, in their opposition to Defendants' motion for summary judgment, Plaintiffs stated that they will not pursue their second cause of action arising under § 1983 (the Monell claim). (Doc. No. 31: 6:25-26.)  Accordingly, Defendants' motion for summary judgment with respect to the Monell Claim is granted.

**I.   Plaintiffs' Section 1983 Claims**

Plaintiffs' remaining § 1983 claims allege that the Deputy Titus, Deputy Philpot, and Deputy Walton violated their Fourth Amendment rights by: (1) using unreasonable, unjustified, and excessive force; and (2) by unlawfully seizing and arresting them. Defendants move for summary judgment on the following grounds: (1) the deputies use of force was objectively reasonable; and (2) the deputies had probable cause to seize and arrest Plaintiffs in light of what transpired on the evening in question.  Defendants also contend that all of Plaintiffs' § 1983 claims are barred because the deputies are entitled to qualified immunity.  Each argument is discussed in turn.

**A.   Fourth Amendment Violation: Excessive Force and Qualified Immunity**

The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Qualified immunity shields an officer from liability even

if his or her action resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotations omitted).  The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*; *see also Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) ("The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties.").

Here, all three deputies have asserted the defense of qualified immunity with respect to Plaintiffs' § 1983 claims.  In determining whether qualified immunity applies, the Court engages in a two-step process.  First, the Court considers whether, taking the facts in the light most favorable to the Plaintiffs, the deputies conduct violated one or more of the Plaintiffs' constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  If the answer is no, the inquiry stops and the defense of qualified immunity applies. *Id.*  However, if the answer is yes, then the Court must determine whether the constitutional right was so clearly established that a reasonable officer would have understood that his conduct violated that right. *See Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier*, 533 U.S. at 201).  The Court has discretion to consider these two factors in reverse order if appropriate. *See Pearson*, 555 U.S. at 236.

### 1.   Excessive Force: Clearly Established Constitutional Right

Plaintiffs' first cause of action contends that the deputies violated their Fourth Amendment right to be free from excessive force.  Therefore, the Court first analyzes the second prong of the *Saucier* test, which considers whether the Plaintiffs' right to be free from excessive force was clearly established on the date of the incident in question, July 28, 2010.  Stated another way, the second prong of the *Saucier* test looks at whether the deputies had "fair warning" that the force used on Plaintiffs was excessive. *See Hope v.*

*Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).  When analyzing this prong, the Supreme Court has made it clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Id.* at 741.  Thus, if the inquiry shows that the deputies had no such warning, the deputies are entitled to qualified immunity.  However, if the inquiry shows that the deputies had such notice, the Court must consider whether the Plaintiffs' rights were violated by the deputies' conduct.

Here, it is beyond dispute that prior to July 28, 2010 it was clearly established that "force is only justified when there is a need for force."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  For example, the application of  a "carotid restraint" or "chokehold" was found to pose a high and unpredictable risk of serious injury or death in 1983, *City of L.A. v. Lyons*, 461 U.S. 95, 116-17, 103 S. Ct. 1660, 75 L. Ed.2d 675 (1983) (Marshall, J., dissenting), and even before 2007, numerous courts had made it clear that using various types of force, including tasers, on a compliant, nonresistant suspect, violated clearly established constitutional rights.  *See*, *e.g.*, *LaLonde v. Cnty of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding use of pepper spray on compliant suspect constitutes excessive force); *Orem v. Rephann*, 523 F.3d 442, 448-49 (4th Cir. 2008) (finding use of taser on uncooperative arrestee while she was restrained constituted excessive force and was clearly established at least by 2005); *Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010) ("Our conclusion that use of the X26 taser and similar devices in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved," *Bryan*, 608 F.3d at 622, falls well within the national mainstream of the decisions which have examined the nature and quality of the intrusion posed by tasers.").

Although none of the cases noted above are factually identical to the case at bar, logical reasoning follows that utilizing a carotid restraint or taser to subdue an individual, hitting an individual in the face with a flashlight or baton, or punching an individual to release his hands in order to handcuff him, could also be unreasonable.  Thus, taking the

1  facts in the light most favorable to the nonmoving party, here the Plaintiffs, a reasonable

2  deputy would have had "fair warning" that causing unnecessary pain to restrain and or

3  subdue a suspect, when the suspect is otherwise complaint, represents excessive force.

4  Accordingly, the Court finds the second prong of the *Saucier* test has been met.

5         **2.**      **Excessive Force: Did the Deputies Violate Plaintiffs' Constitu-
tional Rights**

6         An excessive force inquiry requires examination of the totality of the circum-

7  stances, *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007), and like most

8  other Fourth Amendment issues, are "evaluated for objective reasonableness based upon

9  the information the officers had when the conduct occurred, *Saucier*, 533 U.S. 194 at

10  207.  Courts determine whether the use of force was objectively reasonable through "a

11  careful balancing of the nature and quality of the intrusion on the individual's Fourth

12  Amendment interests against the countervailing governmental interests at stake."

13  *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Under

14  *Graham*, these include: (1) the severity of the crime at issue; (2) whether the suspect

15  poses an immediate threat to the safety of the officers or others; and (3) whether the

16  suspect is actively resisting arrest or attempting to evade arrest by flight.  *See Bryan*, 630

17  F.3d at 818 (quoting *Graham*, 490 U.S. at 396).

18         Under Ninth Circuit precedent, the most important of the *Graham* factors is the

19  threat posed to the officers and bystanders.  *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th

20  Cir. 1994).  Additional factors can be considered, including the availability of less

21  intrusive methods than the force employed.  *See Bryan*, 630 F.3d at 805.  Reasonableness

22  should be judged "from the perspective of a reasonable officer on the scene, rather than

23  with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Additionally, the reason-

24  ableness "must embody allowance for the fact that police officers are often forced to

25  make split-second judgments—in circumstances that are tense, uncertain, and rapidly

26  evolving—about the amount of force that is necessary in a particular situation." *Id.* at

27  396-97.  Moreover, because summary judgment motions in excessive force actions

28  require courts to "slosh [their] way through the fact bound morass of reasonableness,"

*Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal quotations omitted), the Ninth Circuit has stated that district courts should grant such motions sparingly, *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); *Alexander v. Cnty. of L.A.*, 64 F.3d 1315, 1322 (9th Cir. 1995) (stating that in most excessive force cases, the question of reasonableness "is normally a jury question").

Here, Defendants allege that both Plaintiffs made threatening gestures, movements, and/or made physical contact with the deputies, and that such actions by Plaintiffs interfered with the deputies' duties without any legal justification.  Specifically, Defendants contend that Maher was agitated, yelled vulgarities, advanced on the deputies, and made physical contact with Deputy Titus, even though Deputy Titus was not addressing Maher, but another male present at the scene.  Defendants further maintain that when Deputy Philpot attempted to get physical control of Maher to detain him, Maher pulled away from Deputy Philpot and initiated a struggle between himself and Deputy Philpot. With respect to Nader, Defendants argue that Nader became verbally abusive when instructed by the deputies to back down, wherein Nader refused, and instead, advanced on Deputy Titus in a manner that indicated an intent to attack.  Therefore, Defendants maintain that the deputies use of force was objectively reasonable, and that even if the deputies were mistaken as to whether Plaintiffs' conduct constituted a threat, qualified immunity would nonetheless apply because their conduct was not clearly unlawful.

In response, Plaintiffs argue that this is a "classic" example of a factual dispute necessitating determination by a jury, and therefore qualified immunity does not apply. Based on their version of the facts, Plaintiffs allege that they did nothing violent, threatening, assaultive, or resistive during the entire encounter with the deputies.  To the contrary, Plaintiffs contend Deputy Titus unlawfully assaulted Doory, and then, without prior justification, hit Maher in the face with either a flashlight or a baton, after Maher

had complied with Deputy Titus' command to sit down.  Further Plaintiffs allege that Deputy Philpot admits to taking Maher down to the ground with a carotid restraint, wherein Deputy Walton forced his knee into Maher's back and punched him twice before handcuffing him.  Therefore, accordingly to Plaintiffs, none of this force was objectively reasonable or justifiable, as Maher did not strike or even touch Deputy Titus, and did nothing to Deputy Philpot or Deputy Walton.  Moreover, even though Defendants proffer the testimony of Dr. Wagner, who opines that Maher's injuries are inconsistent with being hit by a flashlight, Plaintiffs contend percipient eye witness testimony proves the contrary, and nonetheless, this evidence only exemplifies one of the many factual disputes in the case.  Finally, with regard to Nader, Plaintiffs contend Nader did nothing to justify Deputy Titus' use of the taser because Nader was merely protesting the depu-ties' unlawful use of force on both Doory and Maher, and Nader never advanced or made threatening gestures towards the deputies.  Specifically, contrary to Defendants conten-tions, Plaintiffs argue that Nader did not open and close his hands, clench his fists, or advance on Deputy Titus.

Based on the above, and in consideration of the *Graham* factors, the Court finds there are material factual disputes regarding the events that transpired on the date in question, including the potential safety risk to the deputies and bystanders, and the actual conduct of the deputies and the Plaintiffs—all of which must be left to a jury for final determination.  *See Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004) ("The City asserts explanations and defenses, but they depend on disputed facts and inferences, proper for a jury to consider but not effective to sustain summary judgment.")  Thus, although Defendants contend that Plaintiffs' version of the facts are not plausible, in light of the fact that Maher alleges that the blow to his face rendered him unconscious, thereby limiting his ability to describe the events that occurred thereafter, the Court is not persuaded.  To the contrary, Maher's deposition testimony and corresponding declaration notes that the blow to his face rendered him unconscious, but also notes that after he regained consciousness, he was able to recall the events that followed, including the

1  alleged excessive force employed by Deputy Walton and Deputy Philpot.  *See Anderson*

2  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (finding that credibility

3  determinations cannot be made on a motion for summary judgment, rather, the plaintiffs'

4  evidence must be believed and all inferences must be drawn in their favor).

5       Moreover, although Defendants argue that the use of force was reasonable because

6  the deputies feared for their safety, "[a] simple statement by an officer that he fears for

7  his safety or the safety of others is not enough; there must be objective factors to justify

8  such a concern."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).  Thus,

9  because Plaintiffs and Defendants dispute whether the deputies gave warnings to

10  Plaintiffs before applying the relevant force at issue, and deputies should give warnings,

11  when feasible, if the use of force in effecting seizure may result in serious injury, the

12  Court cannot resolve such disputed facts in adjudicating Defendants' instant motion.  *Id.*

13  at 1284; *see also Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) ("Whenever

14  practicable, a warning must be given before deadly force is employed."); *see also Santos*,

15  287 F.3d at 853 (finding summary judgment in excessive force cases should be granted

16  sparingly because it necessarily involves disputed facts).  Accordingly, because the

17  parties' respective arguments raise genuine disputes of material facts, and therefore a

18  reasonable jury could find that the Plaintiffs did not provoke the deputies and that the

19  deputies could have employed alternative and less forceful methods to control the scene,

20  Defendants' motion for summary judgment on Plaintiffs' § 1983 excessive force claims

21  are hereby DENIED, and Deputy Titus, Deputy Philpot, and Deputy Walton are not

22  entitled to qualified immunity.[14]

23

24  _____

25      [14] Plaintiffs also raised a "duty to intervene" argument in their opposition, stating
that a jury could find that each deputy had the obligation and opportunity to intervene and
prevent the false arrest and excessive use of force employed by each deputy.  (Doc. No.

26  31 at 12-13.)  Defendants contend this does not raise a triable issue of fact because
Plaintiffs were not in custody at the time the force was being used to control them, and

27  there is no evidence that the deputies knew the other deputies were acting unlawfully or
had an opportunity to respond.  (Doc. No. 32 at 2-3.)  These arguments only highlight the

28  disputed issues of material fact, and reinforce the Court's denial of Defendants' instant
motion.

**B.    Fourth Amendment Violation: Unlawful Seizure/False Arrest and Qualified Immunity**

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). A warrantless arrest is lawful, only if there is "probable cause to believe that the arrestee has committed, or is committing, an offense." *Torres v. City of L.A.*, 548 F.3d 1197, 1207 n.7 (9th Cir. 2008); *see also United States v. Chan–Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen."); *Jackson v. Johnson*, 797 F. Supp. 2d 1057, 1063 (D. Mont. 2011) ("An arrest is a more intrusive detention and requires probable cause.").

Here, because the right to be free from a warrantless arrest was clearly established on the date in question, and Plaintiffs were arrested without a warrant following the incident at their apartment complex, Defendants must show that there was probable cause to arrest both Plaintiffs. Probable cause to arrest without a warrant exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.' " *Id.* (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1987)). Thus, "in determining whether probable cause exists for arrest, courts look to "the collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (citation and quotation marks omitted);

1  *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on

2  his § 1983 claim for false arrest and imprisonment, Cabrera would have to demonstrate

3  that there was no probable cause to arrest him.").

4      In the instant case, the deputies arrested Plaintiffs on two charges: (1) violation of

5  California Penal Code § 405(a), lynching; and (2) violation of California Penal Code §

6  69, resisting an officer by force and violence.  (Doc. No. 31 at 4:16-20.)[15]  With respect to

7  Plaintiff Maher, Defendants allege Maher was arrested on the belief that he assaulted

8  Deputy Titus, violently interfered with Deputy Titus' attempt to arrest Doory, yelled

9  vulgarities at all the deputies, beat his chest, advanced on the deputies, refused to follow

10  the deputies' orders, placed his hands on Deputy Titus, and then resisted his own arrest.

11  With respect to Plaintiff Nader, Defendants allege Nader was arrested on the belief that

12  he advanced on the deputies, clenched his fists in a threatening manner, and failed to

13  follow the deputies' orders to get back.  As a result, Defendants contend summary

14  judgment is warranted on Plaintiffs' unlawful seizure/false arrest § 1983 claims because

15  under the totality of the circumstances the deputies believed there was probable cause to

16  arrest both Plaintiffs.  *See Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995) ("

17  Probable cause must be determined at the time the arrest is made.").

18

19

---

20      [15] In pertinent part, California Penal Code § 405(a) prohibits "[t]he taking by means
of a riot of any person from the lawful custody of any peace officer . . . ."  Cal. Penal

21  Code § 405(a).   A riot is further defined as "[a]ny use of force or violence, disturbing the
public peace, or any threat to use force or violence, if accompanied by immediate power

22  of execution, by two or more persons acting together, and without authority of law . . . ."
Cal. Penal Code § 404(a).  Violation of § 405(a) is a felony that is punishable in a state

23  prison for two, three, or four years.  *See* Cal. Penal Code § 405(b).

24      At the time of the incident, California Penal Code § 69 provided: "Every person
who attempts, by means of any threat or violence, to deter or prevent an executive officer

25  from performing any duty imposed upon such officer by law, or who knowingly resists,
by the use of force or violence, such officer, in the performance of his duty, is punishable

26  by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state
prison, or in a county jail not exceeding one year, or by both such fine and

27  imprisonment."  To establish a violation under § 69, the prosecution must prove, among
other things, that the defendant resisted the officer and that the defendant knew he was

28  resisting an officer.  *People v. Hendrix*, 214 Cal. App. 4th 216, 237, 153 Cal. Rptr. 3d
740, 757 (Cal. Ct. App. 2013).

Plaintiffs adamantly oppose Defendants' contentions, arguing that the deputies lacked probable cause to arrest them, and explicitly deny that any of the events, as articulated by Defendants, ever occurred.  Plaintiffs support these allegations with their own declarations and deposition testimony, in addition to percipient witness testimony from individuals who gave statements, under oath, at Plaintiffs' preliminary hearing. (Doc. No. 31, Exs. 6, 7, 8.)  Specifically, Plaintiffs allege that when Maher protested the unjustified and unprovoked attack on Doory, Deputy Titus hit Maher in the face with a flashlight or baton, even though Maher had just complied with Deputy Titus' command to sit down.  Thereafter, Deputy Philpot, who was assisted by Deputy Walton, violently took Maher down in the driveway, pinned him down, punched him at least twice, and then forcibly arrested him.  With regard to Nader, Plaintiffs contend that Nader was at all times a safe distance from the deputies under the tree, and that Nader only verbally protested the deputies' violent attacks on Maher and Doory, which did not warrant the use of a taser to subdue or control him.

In response, Defendants argue that the percipient witness testimony proffered by Plaintiffs, (Exhibit 6: Davis Testimony; Exhibit 7: Sulaiman Testimony; and Exhibit 8: Ms. Henry Testimony), should be excluded as hearsay, and that the judicial ruling on the preliminary hearing, (Exhibit 9), should be excluded because it has no res judicata or collateral estoppel effect in the instant case.  (Doc. No. 32 at 4:14-28.)  Specifically, Defendants argue that because none of the Defendants were parties in the prior criminal case, or in privity of interest with such parties, they had no opportunity to cross-examine the percipient witnesses whose testimony Plaintiffs now seek to admit into evidence. Moreover, with respect to Exhibit 9, the judicial ruling on the preliminary hearing, Defendants contend that "an acquittal is not admissible to prove lack of conduct," and therefore should be excluded.  *State Farm Fire & Cas. Co. v. Poomaihealani*, 667 F. Supp. 705, 706-07 (D. Hi. 1987).  Therefore, Defendants argue that Plaintiffs introduc-

tion of this evidence, in an attempt to raise a genuine dispute of material fact, is improper.[16]

In addition to the arguments posited above, Plaintiffs argue that they should not, and could not, have been arrested for protesting the violent acts of the deputies, as one who verbally criticizes or challenges a police officer is engaged in protected speech under the First Amendment, and is therefore not subject to arrest on that ground. *See, e.g.*, *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461, 107 S. Ct. 2502, 2509, 96 L. Ed. 2d 398 (1987) (stating that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. Speech is often provocative and challenging . . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest"). As a result, Plaintiffs contend that a reasonable jury could find that the "real" reason Plaintiffs were arrested was because they were engaged in protected speech, which the deputies should have been aware is contrary to established law.

Defendants respond, contending that *City of Houston*, the case relied upon by Plaintiffs, is inapplicable because it dealt with a challenge to a statue the Supreme Court found overbroad, and nonetheless, actually supports Defendants' contentions because it shows that the protections afforded by the First Amendment are not limitless, especially as it relates to the exception for fighting words. *See City of Houston*, 482 U.S. at 461-62 ("Critical to our decision was the fact that the ordinance punishe[d] only spoken words" and was not limited in scope to fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace.") (internal quotations omitted); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ("As to the second element,

---

[16] Because these arguments were raised by Defendants in their Reply to Plaintiffs' Opposition, Plaintiffs did not have an opportunity to address Defendants' arguments. However, as noted below, the Court did not consider this evidence in adjudicating Defendants' instant motion for summary judgment. Accordingly, Defendants' evidentiary objections are denied as moot.

1   because defendants had probable cause to arrest plaintiff, an inquiry into the underlying

2   motive for the arrest need not be undertaken.").

3       Here, even after the Court properly excludes the percipient witness testimony

4   proffered by Plaintiffs, *Crawford v. Washington*, 541 U.S. 36, 57, 124 S. Ct. 1354, 1367,

5   158 L. Ed. 2d 177 (2004) (finding "that prior trial or preliminary hearing testimony is

6   admissible only if the defendant had an adequate opportunity to cross-examine"), and the

7   judgment entered in Plaintiffs' underlying preliminary hearing, *State Farm Fire & Cas.

8   Co.*, 667 F. Supp. at 706-07, there is still a genuine dispute of material fact regarding

9   whether Plaintiffs used threats or violence to entice a riot or disturb the peace, (Penal

10  Code § 405(a)), and deter or prevent an executive officer in the performance of his duties,

11  (Penal Code § 69).  *See McKenzie*, 738 F.2d at 1008. (Finding that in a § 1983 action the

12  factual matters underlying the judgment of reasonableness generally mean that probable

13  cause is a question for the jury); *Harper v. City of L.A.*, 533 F.3d 1010, 1023 (9th Cir.

14  2008).  Therefore, based simply on the testimony proffered by Plaintiffs and Defendants,

15  and excluding any evidence that was not known to the deputies at the moment the arrests

16  were made, the Court finds there are still factual disputes that preclude summary judg-

17  ment.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991) ("The disputed facts

18  that prevent resolution of the detention issue on summary judgment also prevent resolu-

19  tion of the question whether police had probable cause to arrest.").

20      The Court also notes that the judicial determination made at Plaintiffs' preliminary

21  hearing is irrelevant to the issue of whether there was probable cause for the deputies to

22  arrest Plaintiffs on the date in question.  Specifically, although the absence of sufficient

23  probable cause to believe Plaintiffs were guilty of Penal Code § 405(a) and Penal Code §

24  69 was the basis for dismissing such claims at the preliminary hearing, this determination

25  does not necessarily mean there was or was not probable cause to arrest Plaintiffs on

26

27

28

1   these charges.[17]   Therefore, even without considering the percipient witness testimony,

2   (Doc. No. 31, Exs. 6, 7, 8) or the findings made at Plaintiffs' preliminary hearing, (Doc.

3   No. 31, Ex. 9), the parties' respective versions of the facts are still diametrically opposed.

4   As a result, the Court finds there are material factual disputes that preclude summary

5   judgment.   Accordingly, Defendants are not entitled to qualified immunity and their

6   motion for summary judgment on Plaintiffs' unlawful seizure/false arrest § 1983 claims

7   are hereby DENIED.

8   **II.      State Law Claims**

9         In addition to the federal causes of action, Plaintiffs allege state law claims against

10   all Defendants for negligence, battery, false arrest, and violation of California Civil Code

11   § 52.1.   Plaintiffs allege the individual deputies are liable based on their own conduct,

12   and the County is liable based on vicarious liability under the doctrine of respondeat

13   superior.   *See* Cal. Gov't Code § 815.2; *see also Scott v. Cnty of L.A.*, 27 Cal. App. 4th

14   125, 139-40, 32 Cal. Rptr. 2d 643 (Cal. Ct. App. 1994) ("Under Government Code

15   section 815.2, subdivision (a), the County is liable for acts and omissions of its employ-

16   ees under the doctrine of respondeat superior to the same extent as a private employer.

17   Under subdivision (b), the County is immune from liability if, and only if, [the employee]

18   is immune.") (emphasis omitted); *White v. Cnty of Orange*, 166 Cal. App. 3d 566, 570,

19   212 Cal. Rptr. 493 (Cal. Ct. App. 1985) (stating that "in governmental tort cases, the rule

20   is liability, immunity is the exception") (citation and internal quotation marks omitted).

21   ///

22   ///

23

24         [17] "A preliminary hearing is a *post facto* determination of probable cause that is
     concerned primarily with whether the prosecution meets its burden of proof, *see*
25   *generally Mills v. Super. Ct.*, 42 Cal. 3d 951, 232 Cal. Rptr. 141, 143-46, 728 P.2d 211,
     213-17 (Cal. 1986), and, at least in some instances, can result in a dismissal of criminal
26   charges even though the existence of probable cause is not considered." *De Anda v. City
     of Long Beach*, 7 F.3d 1418, 1422 (9th Cir. 1993).   In contrast, probable cause to arrest
27   must be based on objectively reasonable information known to the officer at the time of
     the arrest, and cannot be based on facts or evidence obtained as a result of the arrest. *See
28   Wong Sun v. United States*, 371 U.S. 471, 482, 83 S. Ct. 407, 414, 9 L. Ed.2d 441 (1963);
     *Henry v. United States*, 361 U.S. 98, 103, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134 (1959).

### A.      Plaintiffs' Negligence, Battery, and False Arrest Causes of Action

Defendants contend the County is immune from Plaintiffs' negligence, battery, and false arrest state law causes of action.  However, under California law, the County's immunity depends on whether the individual deputies are immune.  *Robinson v. Solano Cnty*, 278 F.3d 1007, 1016 (9th Cir. 2002).  Therefore, because California law denies immunity to police officers and public officials who use excessive force to effectuate an arrest, and the Court has already denied Defendants' motion with regard to Plaintiffs' federal  § 1983 excessive force and false arrest claims, the Court finds that the deputies, and therefore the County, are not immune from Plaintiffs' state law claims for negligence, battery, and false arrest.  *See Mary M. v. City of L.A.*, 54 Cal.3d 202, 215, 285 Cal. Rptr. 99, 814 P.2d 1341 (Cal. Ct. App. 1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct."); *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264, 60 Cal. Rptr. 355 (Cal. Ct. App. 1967) ("California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force."); Cal. Gov't Code § 820.4.  Accordingly, for the reasons set forth above, the Court DENIES Defendants' motion for summary judgment with respect to Plaintiffs' state law claims for negligence, battery, and false arrest.

### B.      Violation of California Civil Code § 52.1 "Bane Act"

Plaintiffs' final cause of action is brought under California Civil Code § 52.1 (the "Bane Act").  The Bane Act proscribes interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . "  Cal. Civ. Code § 52.1(a); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338, 70 Cal. Rptr. 2d 844, 949 P.2d 941 (Cal. 1998) ("The Legislature enacted [Civil Code] section 52.1 to stem a tide of hate crimes.").  The word "interferes with," as used in the Bane Act, means "violates." *Jones*, 17 Cal. 4th at 338, 70 Cal. Rptr. 2d 844, 949 P.2d 941 (California

Supreme Court equates "interferes" with "violates"); *City of Simi Valley v. Super. Ct.*, 111 Cal. App. 4th 1077, 4 Cal. Rptr. 3d 468 (Cal. Ct. App. 2003) (same). Thus, the essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion"), tried to, or did, prevent the plaintiffs from doing something they had the right to do under the law, or to force the plaintiffs to do something they were not required to do under the law. *Jones*, 17 Cal.4th at p. 334, 70 Cal. Rptr. 2d 844, 949 P.2d 941. "[I]n pursuing relief for [ ] constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion." *Venegas v. Cnty of L.A.*, 32 Cal. 4th 820, 843, 11 Cal. Rptr. 3d 692, 87 P.3d 1 (Cal. Ct. App. 2004).

In the instant case, Plaintiffs allege that "the particular acts of excessive force, unlawful detention, false arrest, and retaliation" constituted a violation of Plaintiffs' rights as guaranteed under Article I, Section 13 of the California Constitution, and the First and Fourth Amendments to the United States Constitution. (Doc. No. 5 ¶ 43.) Plaintiffs further allege that these acts were committed by the deputies by means of threats, intimidation, and/or coercion. (*Id.*) As a result, Plaintiffs allege that Maher suffered severe injuries to his face, nose, eyes, mouth, tongue, neck and back, and that Nader suffered pain and injury from being shot with a taser. (*Id.* at ¶¶ 15, 16, 23.) Both Plaintiffs also allege that they have suffered severe fear, humiliation, damage to their reputation, and emotional distress as a result of being arrested, taken to jail, and forced to defend themselves at the preliminary hearing. (*Id.* at ¶¶ 15, 16.) Plaintiff seek actual and punitive damages as a result of the deputies alleged reckless conduct. (*Id.* ¶¶ 44, 45.)

In response, Defendants argue the Bane Act cannot be asserted directly against the County because the Act only applies to private actors and government agents, and not to government entities. *See Venegas v. Cnty of L.A.*, 153 Cal. App. 4th 1230, 63 Cal. Rptr. 3d 741, 750 (Cal. Ct. App. 2007). Defendants also contend that the Bane Act cannot be asserted against the County because there is no express statutory authority under the

California Tort Claims Act ("Tort Claims Act"), Cal. Gov. Code § 815 *et seq*., nor is the County a "person or persons" within the meaning of the Act.  Plaintiffs counter, stating that the County is liable under the Bane Act not because the County is a "person," as defined under the Act, but under the doctrine of respondeat superior, as embodied in California Government Code § 815.2(a).[18]  Finally, with regard to the individual deputies, Defendants argue summary judgment is warranted because the Bane Act does not confer any substantive rights; rather, it is merely an enabling statute that allows a party to recover damages if the plaintiff can prove a separate and distinct violation of his/her federal or state constitutional rights.  *See Justin v. City & County of San Francisco*, No. C05-4815 MEJ, 2008 WL 1990819 (N.D. Cal. May 5, 2008).  Thus, Defendants contend that because there is no separate constitutional right Plaintiffs intended to exercise, in which the deputies impeded by threat, intimidation, or coercion, Plaintiffs' Bane Act claims against the individual deputies must fail.

Contrary to Defendants' contentions, the Court finds both the County and the individual deputies are subject to the Bane Act.  With regard to the County, the language of *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230 (Cal. Ct. App. 2007), the case relied upon by Defendants, is inapposite.  The court in *Venegas* did not state that Section 52.1 does not apply to government entities; rather, it explained: "There is no 'state action' requirement in section 52.1; the statute applies to private actors as well as government agents." *Id.* at 750.  In fact, the court in *Vengeas* found that the plaintiff had a valid Section 52.1 cause of action against the County of Los Angeles.  *Id.* at 746.  Moreover, although no California court has directly interpreted the "person or persons" language included within the Bane Act, several federal courts have concluded that municipalities do fall within the purview of the Act.  *See*, *e.g.*, *Dorger v. City of Napa*, No. 12cv440 YGR, 2012 WL 3791447, at *7 (N.D. Cal. Aug. 31, 2012) ("The City offers

---

[18] In pertinent part, Section 815.2 provides that: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee . . . ."  Cal. Gov. Code § 815.2(a).

no authority for the notion that it cannot be considered a 'person' . . . to the contrary, the authorities interpreting the statute show that a public entity can be liable for 'misconduct that interferes with federal or state laws, if accompanied by threats, intimidation, or coercion, [] whether or not state action is involved' ”); *Cameron v. Blether*, No. 09cv2498 IEG (WMc), 2010 WL 1202318, at *5 (S.D. Cal. March 23, 2010) (rejecting City of San Diego's argument that the Bane Act did not apply to government entities); *Shoval v. Sobzak*, No. 09cv1348 H (JMA), 2009 WL 2780155, at *3 (S.D. Cal. Aug. 31, 2009) (“Defendants have not made a sufficient showing that this definition does not encompass California counties, especially in light of the many cases naming counties as defendants in § 52.1 causes of action.”).  Thus, because Defendants cite no authority that the County is not a “person or persons” within the Act, and the Court has found only contrary authority, such arguments are also without merit.

Finally, the Court finds Defendants' third argument with respect to the Tort Claims Act is also misplaced.  Pursuant to California Government Code § 815.2 (a) and (b), which Plaintiffs highlight in their opposition, “[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee . . .” unless “the employee is immune from liability.”  Therefore, as discussed above, because there is a genuine dispute of material fact precluding a finding of qualified immunity for any of the individual deputies, the County is also not immune.  Therefore, the Court finds Plaintiffs have raised a genuine dispute as to whether the County may be liable under the Bane Act under the doctrine of respondeat superior, and Defendants' arguments in this regard also fail.  *Cf. Zelig v. Cnty of L.A.*, 27 Cal. 4th 1112, 1131, 45 P.3d 1171, 1184 (Cal. 2002) (finding public entity could not be liable under respondeat superior because the plaintiff had failed to allege that the public employees were engaged in conduct within the scope of employment that would render the public employee liable to the plaintiff).

With regard to the individual deputies, the Court finds Defendants' reliance on *Justin v. City & Cnty of S.F.*, No. C05-4815 MEJ, 2008 WL 1990819 (N.D. Cal. May 5, 2008) misguided.  In *Justin*, the district court stated: "Section 52.1 is only applicable when a defendant intends by his or her conduct to interfere with a separate, affirmative right enjoyed by a plaintiff; it does not apply to a plaintiff's allegation of use of excessive force absent a showing that the act was done to interfere with a separate state or federal constitutional right."  *Id.* at *9.  However, the district court in *Justin* supported the above statement solely with a citation to a California Supreme Court case, *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 70 Cal. Rptr. 2d 844, 949 P.2d 941 (1998), wherein the court addressed an entirely different issue.  The issue in *Jones* was whether the plaintiff could base his Section 52.1 claim on the unlawful search and seizure by defendants, who were private actors, not government officials.  *Id.* at 847.  Thus, the *Jones* court held that, in the context of an alleged interference with Fourth Amendment rights, "[w]hen [plaintiffs] assert that defendants interfered with those rights by directly violating them, they are mistaken: Only the government or its agents can do so."  *Id.*

Here, however, unlike in *Jones*, Plaintiffs allege that Defendants acted under color of state law by using force or violence, by means of the excessive force Plaintiffs allege was employed by the deputies, to interfere with their First and Fourth Amendment rights, in addition to rights afforded under the Article I, Section 13 of the California Constitution.  *Cf. Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 954 (E.D. Cal. 2011) ("It is not sufficient that the right interfered with is the right to be free of the force or threat of force that was applied. The court has found that Plaintiff in this case was not seized and has not suffered a cognizable constitutional injury under either the Fourth or Fourteenth Amendments.").  Thus, although Defendants argue that the deputies' conduct is not actionable because Plaintiffs corresponding conduct amounted to unprotected "fighting words," such a determination is dependent on a resolution of disputed material facts, and requires a determination by a jury.  Accordingly, Defendants' motion for summary

judgment with respect to Plaintiffs' § 52.1 cause of action under the Bane Act is hereby DENIED.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment in GRANTED IN PART and DENIED IN PART.  Specifically, the Court GRANTS Defendants' motion for summary judgment with respect to Plaintiffs' second cause of action under 42 U.S.C. § 1983 (the Monell Claim), and DENIES Defendants' motion for summary judgment with respect to Plaintiffs' first cause of action under 42 U.S.C. § 1983 (excessive force and unlawful seizure/false arrest); and Plaintiffs' third through sixth causes of action against all Defendants for negligence, battery, false arrest, and violation of Civil Code § 52.1.  The parties should also be cognizant that the final pretrial confer-ence is currently set for **June 14, 2013**.  (Doc. No. 16.)

IT IS SO ORDERED.

DATED:  April 29, 2013

Hon. Anthony J. Battaglia
U.S. District Judge